## AKERS et ux. v. SCOFIELD.
### No. 12176.

Circuit Court of Appeals, Fifth Circuit.
April 23, 1948.

Robert Ash, of Washington, D. C., for appellants.

Melva M. Graney and Sewall Key, Sp. Assts. to the Atty. Gen., Theron L. Caudle, Asst. Atty. Gen., and Henry W. Moursund, U. S. Atty., of San Antonio, Tex., for appellee.

Before HUTCHESON, HOLMES, and WALLER, Circuit Judges.

WALLER, Circuit Judge.

Mrs. Dora Roberts, a widow, the possessor of many acres, much money, great age, and limitless credulity, made a deal with James A. Akers whereby she agreed to, and did, advance large sums of money to him for the purpose of acquiring some maps which Akers and his confederate, Forrest, represented were in existence in Mexico and which would reveal the location, on her ranch, of much buried gold.

The treasure hunt was initiated by Mrs. Roberts paying Akers $1,600 for the purpose of enabling him to go to Mexico and to purchase the first map. In due course he produced a map, and by its pretended use directed the treasure seekers to a designated spot on the Roberts ranch whereat a quantity of metal bars, resembling gold,

was dug up. Akers had made, or caused to be made, the map out of his imagination and the "gold" bars out of brass.

It was agreed that the widow would bear all expenses of the enterprise, and that whatever treasure was recovered would be divided equally between Akers and the widow, but due to the federal restrictions against the possession of gold it was also agreed that the bars would be kept in a closet in the home of Mrs. Roberts until the day arrived that the gold could be converted into spending money. Akers divided the "expenses" so received with his confederate, Forrest. Thereafter, Akers reported that he had located another map in Mexico, but this time it would take $4,000 to acquire it. This process was repeated on numerous occasions and more maps were obtained, and more bars were located, unearthed, and stored in the widow's closet against the day when gold bars would not be contraband. During the period from 1932 through 1936 the widow advanced to Akers under such circumstances and for such purposes a total of $272,200.

Eventually the time arrived when Akers represented to the widow that gold could be sold in Galveston and while proceeding toward that city in a truck containing the bars, misfortune overtook him—according to his report—and he was hijacked—robbed of the entire load. That was in February of 1935. In September of 1936 Mrs. Roberts discovered the skulduggery and ceased to advance any further money. Chagrined at having permitted herself to be so defrauded, she failed to report the transactions to any law enforcement agency or to demand a return of the money or to institute any action for its return. The statute of limitations of Texas would have barred her from taking any legal action after September 27, 1938.

Akers and his wife filed separate individual income tax returns for the calendar year 1936, each reporting net community income, but no returns were filed by Akers or his wife for the years 1932-1935, inclusive, and in no return was there included the money received by Akers from Mrs. Roberts. In passing, it may be noted that he was sentenced to the penitentiary for this omission. Income taxes were assessed, however, by the Commissioner. These taxes were reluctantly paid and this suit brought against the Collector of Internal Revenue of the First District of Texas to recover the taxes on the theory that they were illegally required of him. From a judgment denying recovery this appeal has developed.

The facts are stipulated. The contention of Akers is that the amount received by him from Mrs. Roberts was not a "gain derived from capital, from labor, or from both combined," nor a "profit gained through a sale or conversion of capital assets."[1] He urges here that the legal principle involved is similar to that in our case of McKnight v. Commissioner, 5 Cir., 127 F.2d 572, and in the case of Commissioner of Internal Revenue v. Wilcox, 327 U.S. 404, 66 S.Ct. 546, 90 L.Ed. 752, 166 A.L.R. 884, wherein defenses against liability for income taxes were sustained on the theory that the funds involved in those cases were obtained by embezzlement whereby no title ever passed to the alleged taxpayer.

The Commissioner insists that this case is distinguishable from the McKnight and Wilcox cases in that the title to embezzled funds does not pass to the embezzler, whereas in the present case Akers was guilty of swindling, and that the title to the money so obtained passed to him under the statutes of Texas.

The lower Court stated:

"This is not a case of embezzlement; it is one of swindling. When funds are embezzled no title passes. Swindling is defined by the Penal Code of Texas Article 1545: ' "Swindling" is the acquisition of any personal or movable property, money or instrument of writing conveying or securing a valuable right, by means of some false or deceitful pretense or devise, or fraudulent representation, with intent to appropriate the same to the use of the party so acquiring, or of destroying or impairing the right of the party justly entitled to same.'

---

[1]. Eisner v. Macomber, 252 U.S. 189, 40 S.Ct. 189, 193, 64 L.Ed. 521, 9 A.L.R. 1570.

"The distinction between theft and embezzlement on the one hand and swindling on the other is that in the former case title to the property acquired never passes while in the latter case title does pass. State v. Vickery, 19 Tex. 326; Bink v. State, 50 Tex.Cr.R. 445, 98 S.W. 863; Lewis v. State, 75 Tex.Cr.R. 509, 171 S.W. 217; Gordon v. State, 85 Tex.Cir.R. 641, 214 S.W. 980.

"James A. Akers acquired from his victim not only the possession but the title to the money here involved. Until this title was divested out of him by court action brought by the one defrauded, he had the legal right to retain and pass title to his ill gotten gains. That he did do so is admitted. In my opinion, the stipulated facts show conclusively that Akers received the money in question under a claim of right, without restrictions as to its disposition."

■ The foregoing clear and correct statement of the law is abundantly sustained by the cases cited,[2] and the application of the law to the facts in this case is apt and accurate. Whether the person swindled could have brought suit and recovered judgment against Akers for the amount of the money so fraudulently obtained, standing alone, is not determinative of the tax consequences. Akers fixed his status in relation to this money by the representations that he made in securing it; that is to say, he never established, nor intended to establish, the relation of debtor and creditor, or trustee and cestui que trust. He took the money and intended to, and did, keep it as his. After thus fixing its status by his own acts and representations, he is estopped, when the income tax consequences are about to be fastened on it, from asserting the existence between him and Mrs. Roberts of the relation of debtor and creditor, or from now asserting as a defense that the title to the money, of which he had so glibly deprived Mrs. Rob-

erts and the color of which he never expected her to see again, is still in her.

■ Moreover, a transaction induced by fraudulent representations is not void but voidable, and, in the absence of an election to rescind, title that passed in such a transaction will continue in the recipient.

[4] This suit is for the refund of taxes, and such suits proceed on the same equitable principles as underlie an action in assumpsit for money had and received. Of such an action it was said, in United States v. Jefferson Electric Co., 291 U.S. 386, 54 S.Ct. 443, 449, 78 L.Ed. 859, that:

"This is often called an equitable action and is less restricted and fettered by technical rules and formalities than any other form of action."

In Stone v. White, 301 U.S. 532, 57 S.Ct. 851, 853, 81 L.Ed. 1265, the holdings in the Jefferson Electric Co. case, supra, were reaffirmed, the Court there saying:

"The statutes authorizing tax refunds and suits for their recovery are predicated upon the same equitable principles that underlie an action in assumpsit for money had and received. United States v. Jefferson Electric Co., 291 U.S. 386, 402, 54 S.Ct. 443, 449, 78 L.Ed. 859. Since, in this type of action, the plaintiff must recover by virtue of a right measured by equitable standards, it follows that it is open to the defendant to show any state of facts which, according to those standards, would deny the right, * * *."

■ Appellants are the movers in this case, and, as such, must carry the burden of showing their right to equitable relief, ex æquo et bono. It seems clear in this case that they have not a case in which, under equitable standards, they are entitled to succeed.

The judgment of the Court below is affirmed.

2 See also: North American Oil Consolidated v. Commissioner, 286 U.S. 417, 52 S.Ct. 613, 76 L.Ed. 1197; Moore v. Thomas, 5 Cir., 131 F.2d 611; Caldwell v. Commissioner, 5 Cir., 135 F.2d 488.