Minette S. Macias v. Commissioner.
Macias v. Commissioner
Docket No. 58011.
United States Tax Court
T.C. Memo 1957-174; 1957 Tax Ct. Memo LEXIS 75; 16 T.C.M. (CCH) 783; T.C.M. (RIA) 57174; September 20, 1957
*75 Malcolm K. Whyte, Esq., 735 N. Water Street, Milwaukee, Wis., and John L. Palmer, Esq., for the petitioner. James T. Wilkes, Jr., Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The Commissioner determined the following deficiencies in income tax and additions to tax: Additions to Tax
Year
Tax
Sec. 293(b)
Sec. 294(d)
1948
$1,722.66
$861.33
$250.08
1949
1,738.22
869.11
241.66
The questions for decision are (1) whether certain payments received by Arturo C. Macias in 1948 and 1949 were taxable income; (2) whether the returns filed were false and fraudulent with intent to evade tax and whether any part of the deficiency for either year was due to fraud with intent to evade tax; (3) if not, whether the year 1949 is "open" by reason of a 25 per cent omission from gross income. No evidence was introduced pertaining to certain other allegations of error made by petitioners and we treat the issues made by those allegations as abandoned by petitioners. Findings of Fact Some of the facts are stipulated, are so found and the stipulated facts and the pertinent exhibits are included herein *76 by reference. Minette S. Macias, petitioner herein, resides in Milwaukee, Wisconsin. She and her former husband, Arturo C. Macias, from whom she was divorced in 1954 timely filed joint income tax returns for 1948 and 1949 with the collector of internal revenue for the district of Wisconsin. Joint notices of deficiencies for those years were sent by the Commissioner by registered mail on March 11, 1955 to Minette and Arturo at their last known address pursuant to section 272(a)(1) of the Internal Revenue Code of 1939. Arturo filed no petition from the notice and the full amount of the deficiencies and additions to tax, plus interest were assessed and abated uncollectible. Arturo was employed by Lakeside Laboratories, Inc. from January 1, 1940 until March 28, 1953. In 1945 he became vice president of two newly formed subsidiaries of that firm, namely Lakeside Export Corporation (hereafter called Export) and Lakeside International Corporation. As such, he conducted the business of the subsidiaries under the direction of their president, Evan P. Helfaer. Export was engaged in the sale of ethical drugs in the Western Hemisphere, including Mexico. At all times during 1948 and 1949 *77 the exclusive independent distributor for the products of Export in Mexico was Farmaceuticos Lakeside, S.A., hereinafter referred to as Farmaceuticos. The president, manager and sole owner of Farmaceuticos was Georg Warschawski. During the years 1943 to 1953, Arturo, as agent for Export, sold pharmaceutical products to Farmaceuticos. These sales were negotiated by personal contact and agreement between Warschawski and Arturo. During 1943 Arturo entered into a personal agreement with Warschawski, whereby he was to receive a 2 per cent payment from Farmaceuticos for all sales from Export to Farmaceuticos. In 1947 this payment was reduced to 1 per cent and during the years 1948 and 1949 it was further reduced one-half. During the years 1948 and 1949 Arturo received payments of $4,895.20 and $5,001.35 pursuant to this arrangement. Over the years 1943 through June 3, 1952 Arturo received upwards of $24,000 from these payments. These sums were sometimes paid in cash to Arturo and sometimes by check. So far as Warschawski was concerned, the payments were made to Arturo in order to secure an exclusive contract for the sale of Lakeside pharmaceuticals by Farmaceuticos in Mexico and in the *78 hope that lower prices would be charged. Prices quoted to Farmaceuticos were controlled by Arturo under the direction and supervision of Helfaer. The amounts paid by Farmaceuticos to Arturo were not included in the billings made by Export for the sales which it made to Farmaceuticos. They were separate from amounts paid to Export and the result of a personal deal between Arturo and Warschawski. Arturo was not authorized by Helfaer to collect these payments from Farmaceuticos on behalf of Export. During 1948 and 1949 Export had no knowledge or reason to believe that Arturo was receiving payments from Farmaceuticos. In 1952 Warschawski made a business trip to Milwaukee and for the first time informed Helfaer that Arturo had been paid side money or a "mordida" (as the payments were termed by Warschawski). Helfaer then instructed Warschawski to cease making any payments to Arturo and indicated his disapproval of the practice. Warschawski thereupon discontinued payment of the mordida. On March 30, 1953, while Arturo was in Europe he was discharged by Helfaer. Lakeside Laboratories, Inc., Export and Lakeside International Corporation were insured during all times pertinent hereto *79 against losses through dishonest acts of employees. On February 16, 1954, the companies filed a proof of loss with the America-Associated Insurance Company under their comprehensive dishonesty and destruction policy. Losses were claimed in the total amount of $54,883.67 under the dishonesty coverage of the policy. Of this amount $24,885.48 was claimed by Export as recoverable because of the funds received by Arturo from Farmaceuticos. Representatives of International, Export and the insurer settled the entire claim for $15,000. This settlement was made on the basis of a revised proof of loss filed by Export on June 21, 1954. Export received $7,648.40 in full satisfaction of the insurer's liability under said policy, the balance being paid to International. No admission of finding of embezzlement by Arturo was made by the insurer as a basis of this settlement. Payments made by Farmaceuticos to Arturo were largely deposited in one or more personal bank accounts of Arturo unknown to petitioner. They were not reported for Federal income tax purposes. Prior to the discovery by Helfaer of the payments to Farmaceuticos and of other "dishonest" acts of Arturo, Arturo owned a farm in *80 Mexico. Since that time Arturo "is supposed to be in Mexico." During the early part of the year 1952, Arturo transferred his house at 4476 North Stowell Avenue, Milwaukee, Wisconsin, into his wife's name. In the latter part of 1952, he transferred 250 shares of stock in Lakeside Laboratories to his wife. In 1953, Arturo transferred an additional 750 shares of Lakeside Laboratories stock to his wife. Prior to his departure for Mexico, he also transferred an automobile to his wife. The revenue agent who examined Arturo's returns for the years 1947 through 1952 mailed a letter to Arturo at his Mexican address advising him of the apparent omissions from income and requesting an explanation. No response to this letter was received. The joint income tax returns of Arturo and petitioner for the taxable years 1948 and 1949 included no income of the petitioner and the statutory notice of deficiency included no income of the petitioner. The Commissioner determined that the payments received by Arturo from Farmaceuticos constituted income to Arturo. Petitioner had no knowledge of any dishonest acts perpetrated by her husband until advised about them by his employer in March of 1953. *81 The payments made by Farmaceuticos to Arturo and retained by him did not constitute embezzlement by Arturo. The deficiencies of petitioner and her husband for the years 1948 and 1949 are due, in part, to fraud with the intent to evade Federal income taxes. The tax returns for 1948 and 1949 were false and fraudulent with intent to evade tax. Arturo and petitioner filed no declaration of estimated tax for the taxable years 1948 and 1949. They had sufficient income to require the filing of such returns. The failure of Arturo and petitioner to comply with the provisions of section 294(d)(1)(A) of the Internal Revenue Code of 1939 is not shown to be due to reasonable cause rather than willful neglect. Opinion As we understand it, on the fraud issues, petitioner's basic argument is that the funds received by Arturo from Farmaceuticos were moneys to which he had no legal or equitable claim, but, on the other hand, were funds which he had a definite and unqualified obligation to turn over to Export. In other words, Arturo was an embezzler and since embezzled funds were not taxable to him under existing decisions of the United States Supreme Court or Treasury Department rulings, *82 his failure to report the same could not be fraudulent. This contention is not well taken. Arturo filed no petition with this Court. He did not appear as a witness. He was never indicted, let alone directly accused by his employer of embezzlement. True, a proof of loss was filed with the insurer by his employer claiming embezzlement, and a settlement was reached between the employer and the insurer but this settlement was obviously a compromise and based on so-called dishonesty rather than any criminality such as embezzlement. The petition filed herein alleges embezzlement by Arturo, apparently in an effort to bring this case within the cover of Commissioner v. Wilcox, 327 U.S. 404 which held that embezzled money does not constitute taxable income. There have been cases "where an occasional taxpayer has firmly insisted upon being recognized and classed as a self-made embezzler hoping to avoid the economic impact, and penal provisions of the Internal Revenue Code * * *." United States v. Wyss, 239 Fed. (2d) 658 (C.A. 7, 1957). The skimpy cover of Wilcox cannot be stretched so far. See Rutkin v. United States, 343 U.S. 130, and W. L. Kann, 18 T.C. 1032, *83 affd. (C.A. 3, 1953) 210 Fed. (2d) 247. Petitioner argues that whether or not Arturo was guilty of embezzlement depends upon a construction of Section 343.20(1), 1947 Wis. Stats., which in pertinent part provides that "any * * * agent * * * employee or servant of any * * * corporation * * * who, by virtue of his business or employment, shall have the care, custody, or possession of * * * any money * * * belonging to such other * * * corporation shall embezzle or fraudulently convert to his own use * * * any such money * * * shall be punished * * *." We do not think, on the facts before us, that Arturo embezzled the moneys in question from his employer. These moneys were not part of the charge made by Lakeside to Farmaceuticos. All amounts billed by Lakeside were paid by Farmaceuticos and received by Lakeside. Arturo did not convert to his own use any moneys so paid over. The funds which are sought to be taxed here, as we see it, never belonged to Lakeside. They were paid to Arturo as a result of a private arrangement between him and Warschawski. This arrangement had no approval from Lakeside and even if Lakeside might have had some right to recover from Arturo this *84 does not mean that Arturo was guilty of embezzlement or that the funds were not taxable to him. See United States v. Wyss, supra, and Kann v. Commissioner, 210 Fed. (2d) 247 (C.A. 3, 1953), affirming 18 T.C. 1032. Petitioner further states on brief: "Succinctly stated, the argument against confirming a fraud penalty here is this. In 1949 and 1950, when Arturo Macias filed joint returns for himself and his wife, the Wilcox decision and G.C.M. 24945 flatly and plainly ruled that embezzled sums were not taxable. Arturo Macias had embezzled the sums here in question from his employer. He did not report them as income received in 1948 and 1949. Even if the Wilcox case and G.C.M. 24945 might later be interpreted to mean something different from what they said, they certainly provided reasonable grounds for believing in the period 1948-1950 that embezzled sums were not returnable as income to the embezzler. And at the very least, Macias had reasonable ground for believing that the means by which he acquired such sums fell within the definition of embezzlement rather than a species of fraud outside the Wilcox rule. We do *85 not know, and we have no means of knowing, precisely what Macias believed with respect to the taxability of these sums. It is safe to say, however, that in 1949 and 1950 it would have been unreasonable for him to have believed that a tax was owing on embezzled sums in the face of the highest court's flat holding that it was not. It will be seen that the United States Courts have uniformly held that in such circumstances a penalty for fraud is not proper." Some such argument was relied on in a criminal case to exculpate the defendant from the charge of fraud. There the Court said in United States v. Moran, 236 Fed. (2d) 361 (C.A. 2, 1956), certiorari denied 352 U.S. 909: "There was sufficient evidence of willfulness in 'a consistent pattern of underreporting large amounts of income.' See Holland v. United States, 349 [348] U.S. 121. It is asserted in defendant's brief on appeal that the defendant might have relied in good faith during the indictment years (prior to the opinion in Rutkin) on the applicability of C.I.R. v. Wilcox, 327 U.S. 404, 66 S. Ct. 546, 90 L. Ed. 752 (holding embezzled funds non-taxable) to extorted funds, and therefore *86 did not willfully evade his income taxes. As to this, it is enough to say that there was no evidence that defendant had actually relied on the Wilcox case. The evidence was sufficient to support the finding of willfulness which was implicit in the verdict." The same can be said here, and possibly with more force, this being a civil rather than a criminal cause. There simply is no evidence that Arturo knew of the Wilcox decision or ever had any idea that the funds received from Farmaceuticos might be non-taxable to him. After a careful consideration of the whole record we hold that the payments were taxable income, that the Commissioner has shown by clear and convincing evidence that the tax returns for 1948 and 1949 were false and fraudulent with intent to evade tax, and that at least a part of the deficiencies for each year was due to fraud with intent to evade tax. That Arturo received the moneys, placed most of them in bank accounts secret from petitioner and failed without explanation of any sort to report them to the taxing authorities is abundantly clear from the record. The unreported amounts were substantial in each of the years in question. This is convincing evidence *87 of fraud. Arlette Coat Co., 14 T.C. 751, and see United States v. Moran, supra.This makes it unnecessary to say anything further on the issue of whether Arturo and petitioner failed to include in income for 1949 an amount in excess of 25 per cent of their gross income for that year. Both years were open because of fraud. Whether the fraud was that of the husband or wife, or both, is immaterial since the liability is joint and several, Myrna S. Howell, 10 T.C. 859, affd. 175 Fed. (2d) 240 (C.A. 6, 1949). We also hold that petitioner has not shown that the failure to file a declaration or pay installment of estimated tax was due to reasonable cause and not to willful neglect and accordingly the additions to tax determined under section 294(d) are approved. Decision will be entered for the respondent.